UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSEPH T. STAKEY,<br><br>                    Plaintiff,<br><br>        v.<br><br>DEPUTY KYLE O'BRIEN,<br><br>                    Defendant. | Case No. 1:22-cv-00513-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff Joseph T. Stakey is a prisoner in the custody of the Idaho Department of Correction. Stakey is proceeding pro se and in forma pauperis in this civil rights matter.

Stakey claims that Defendant Custer County Sheriff's Deputy Kyle O'Brien used excessive force during the course of Stakey's arrest and that O'Brien handcuffed Stakey too tightly. Stakey has been allowed to proceed on these excessive force claims under 42 U.S.C. § 1983, as well as Idaho state law claims of assault and battery, against O'Brien. All other claims against all other Defendants have been dismissed. *See* Dkt. 29 at 8.

O'Brien has filed a Motion for Summary Judgment and a Motion to Strike. In support of his Motion for Summary Judgment, O'Brien argues that Stakey's § 1983 claims fail because (1) O'Brien did not violate Stakey's constitutional rights, (2) O'Brien is entitled to qualified immunity, and (3) Stakey's claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). As for Stakey's state law claims, O'Brien contends he is immune from those claims under the Idaho Tort Claims Act, Idaho Code § 6-901, *et seq. See generally Memo. in Supp. of Mot. for Summ. Judg.*, Dkt. 39-1.

The parties have filed responsive briefing, and the motions are ripe for adjudication. Having fully reviewed the record, the Court concludes the facts and legal arguments are adequately presented in the briefs and record, and oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1(d).

For the reasons explained below, the Court concludes as follows: (1) Stakey's claim of excessive force during the course of his arrest is barred by *Heck v. Humphrey*; (2) Stakey's excessive force claim based on the tightness of the handcuffs fails because O'Brien has shown—and Stakey has not rebutted—that O'Brien's actions in handcuffing Stakey did not constitute excessive force in violation of the Fourth Amendment; and (3) O'Brien is immune from Stakey's state law claims.[1] Accordingly, the Court will grant O'Brien's Motion for Summary Judgment and deny O'Brien's Motion to Strike as moot.

## 1.     O'Brien's Motion to Strike

As an initial matter, O'Brien moves to strike Stakey's Declaration and exhibits (Dkt. 44-2 and 44-3) on the grounds that Stakey refused to sit for his deposition and that the documents contain hearsay. *See* Dkt. 47 at 2-4. Stakey does not dispute that he left the deposition when questioning began but contends defense counsel did not warn him that this might affect his ability to introduce evidence. Instead, defense counsel purportedly told Stakey only that, if Stakey refused to continue the deposition, counsel would file a motion for additional time to complete it. Dkt. 51 at 7.

Even considering the information in Stakey's Declaration and exhibits, the Court has determined that O'Brien is entitled to judgment as a matter of law. Therefore, the Motion to Strike will be denied as moot.

---

[1]     Consequently, the Court need not consider Defendant's other arguments.

2.      **O'Brien's Motion for Summary Judgment**

    A.      ***Standard of Law Governing Summary Judgment***

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

In resolving a summary judgment motion, the Court must consider the facts in the light most favorable to the nonmoving party, unless the nonmoving party's version of the facts is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If such a blatant contradiction exists, then there is no "genuine" dispute as to that fact. *Id*.

The moving party bears the initial burden to show that each material fact cannot be disputed. Material facts are those "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, the moving party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247-48. Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact. *Id.*

If the moving party meets this initial responsibility, the burden then shifts to the nonmoving party to establish that a genuine dispute as to any material fact does indeed exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the nonmoving party's position is insufficient. Instead, "there must be evidence on which [a] jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Rather, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

That is, "if a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). If the plaintiff fails to produce evidence, or if the evidence produced is insufficient, the Court "is not required (or even allowed) to assume the truth of the challenged allegations in the complaint." *Id.*

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled

to it." Fed. R. Civ. P. 56(e)(3). Where, as here, the party moving for summary judgment would not bear the burden of proof at trial, the moving party may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

Affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In determining admissibility for summary judgment purposes, it is the content of the evidence, rather than its form, that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences which can be drawn from the evidence must be drawn in the light most favorable to the nonmoving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

In cases involving pro se inmates, courts liberally construe the pleadings and briefs and "should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, although pro se inmates are exempted "from *strict* compliance with the summary judgment rules," they are not exempted "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). In opposing a motion for summary judgment, a pro se inmate must submit at least "some competent evidence," such as a "declaration, affidavit, [or] authenticated document," to support his allegations or to dispute the moving party's allegations. *Id.* at 872, 873 (upholding grant of summary judgment against pro se inmate because the "only statements

supporting [plaintiff's] . . . argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order").

### B.    Factual Background

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Stakey's version of facts, insofar as that version is not blatantly contradicted by clear documentary evidence in the record. *See Scott*, 550 U.S. at 380.

Stakey has a hearing impairment and a slight speech impediment. Stakey wears two hearing aids and also relies on reading lips. *Decl. of Joseph T. Stakey* ("*Stakey Decl.*"), Dkt. 44-2, ¶ 5.

On the evening of November 14, 2021, Stakey and his girlfriend were staying at a hotel in Stanley, Idaho. O'Brien was also at the hotel and began asking Stakey and his girlfriend questions. Stakey contends O'Brien was dressed as a security guard and was not identifiable as a law enforcement officer. *Stakey Decl.*, ¶¶ 8-9. Stakey gave O'Brien a fake name, stating his last name was "Smith." *Ex. A to O'Brien Decl.*, Bates No. 126.

Thirty minutes later, Stakey saw O'Brien looking in the bed of Stakey's truck and writing something down in a notebook. O'Brien then left. *Stakey Decl.* ¶ 13.

The next day, on November 15, 2021, O'Brien was dispatched to a call regarding a potential domestic disturbance at the same hotel. The individuals involved in the disturbance fled the hotel in a vehicle traveling at a high rate of speed. Two law enforcement officers—Deputy Ron Pumphrey with the Custer County Sheriff's Office, and Conservation Officer Kyle Christiansen with the Idaho Department of Fish and Game—executed a high-risk stop of the vehicle. The occupants of the vehicle turned out to be Stakey and his girlfriend. *Decl. of Kyle O'Brien* ("O'Brien Decl."), ¶¶ 3-6; *Decl. of Kyle Christiansen* ("Christiansen Decl."), ¶¶ 5-6. Both were placed in handcuffs.

The Court has reviewed the bodycam footage of Deputy O'Brien and Officer Christiansen. That footage reveals the following:

- Because neither Pumphrey nor Christiansen had a vehicle with a cage, these two officers detained Stakey and his girlfriend until O'Brien could arrive on the scene. Stakey initially screamed profanities and insults at Pumphrey and Christiansen.

- Stakey said he had some alcohol the night before but none that day. Stakey's girlfriend told Christiansen that Stakey was on steroids but that he had not taken any other drugs.

- O'Brien arrived and began questioning Stakey. Stakey told O'Brien that he was on probation for arson and that he had killed someone. Stakey said he gave O'Brien a fake name the night before because of his probationary status.

- Stakey told O'Brien that his girlfriend had punched him in the left side of his face, near his hearing aid.

- Stakey said he took the prescription medications Klonopin, Depakote, and Valium but that he was not on any pain medication.

- Stakey repeated himself multiple times.

- O'Brien informed Stakey that he would be administering field sobriety tests. O'Brien performed a horizontal gaze nystagmus test and observed signs of impairment. Stakey was uncuffed so he could continue the field sobriety tests.

- O'Brien then attempted to have Stakey perform a walk-and-turn test. Stakey did not follow O'Brien's instructions for the walk-and-turn test, repeatedly falling or moving out of position despite repeated warnings.

MEMORANDUM DECISION AND ORDER - 7

- O'Brien again asked Stakey if he could do the walk-and-turn test, to which Stakey responded that he "plead[ed] the Fifth." O'Brien asked if Stakey was refusing to take the test and told him he would be arrested for such a refusal. Stakey said he was not refusing, and O'Brien tried to start the test again.

- Stakey again did not follow O'Brien's instructions regarding the walk-and-turn test.

- O'Brien told Stakey his next instruction was Stakey's "last chance" with respect to the walk-and-turn test; if Stakey did not follow O'Brien's instructions, Stakey would be arrested for refusing to take the field sobriety test.

*Ex. A to O'Brien Decl.*, Bates No. 126; *Ex. A. to Christiansen Decl.*, Bates Nos. 115, 116, 117, 118, 124; *see also O'Brien Decl.* ¶¶ 10, 12.

According to Stakey, he did not clearly hear or understand O'Brien's instructions due to his hearing impairment—not because he had been drinking or using another substance. *Am. Compl.*, Dkt. 30, ¶ 38. Of course, the fact that Stakey has a hearing and speech impediment—and that O'Brien knew this—does not rule out the possibility that Stakey was *also* under the influence of alcohol or other substances or that, if he was not under the influence, a reasonable officer could have suspected he was.

After O'Brien warned Stakey it was his last chance to take the test, Stakey walked out into the middle of the highway against O'Brien's instructions. O'Brien ordered Stakey to place his hands behind his back and said, "You're done." *Ex. A to O'Brien Decl.*, Bates No. 126; *Ex. A. to Christiansen Decl.*, Bates No. 124.

The clearest view of what happened next can be seen from the footage of Christiansen's bodycam. O'Brien took Stakey's arms and began to place them behind Stakey's back. Stakey roughly yanked his arms out of O'Brien's grasp and began to turn toward O'Brien. *Ex. A. to*

*Christiansen Decl*., Bates No. 124. O'Brien then took Stakey to the ground so Stakey was prostrate.

O'Brien tried to protect Stakey's head as they went down, but Stakey hit the ground face first. O'Brien's hand ended up between Stakey's body and the street, with O'Brien landing on Stakey's back with his arm around Stakey's neck. *O'Brien Decl*., ¶¶ 14-15; *Am. Compl*. ¶ 46.

Stakey did not comply with O'Brien's repeated orders to place his hands behind his back. O'Brien then struck Stakey several times. *Ex. A to O'Brien Decl*., Bates No. 126; *Ex. A to Christiansen Decl*., Bates No. 124. Stakey claims O'Brien used a choke-hold. *Am. Compl*. ¶ 53.

Stakey rolled onto his back. He grabbed O'Brien's arm and tore off O'Brien's watch. *O'Brien Decl*., ¶¶ 15-20; *Christiansen Decl*., ¶¶ 13-17. Both officers testify that Stakey violently resisted and kept attempting to pull away from them while they were attempting to subdue Stakey. Stakey, however, contends he did not "pose any threat to safety, [and] was not resisting arrest or attempt[ing] to flee." *Am. Compl*. ¶ 45; *see also Stakey Decl*., ¶¶ 36-38.

The bodycam footage belies Stakey's contention that he was not resisting arrest. It shows Stakey refusing to comply with O'Brien's orders to place his hands behind his back. Both officers had to exert significant energy attempting to place Stakey in handcuffs because Stakey refused to cooperate. Stakey would not move his arms despite the officers' repeated orders and attempts to move them. Stakey finally began to comply with officers' instructions, but not until after he was warned he would be tased. Ultimately, Stakey was handcuffed with a double lock, so the handcuffs would not get any tighter. *Ex. A to O'Brien Decl*., Bates No. 126; *Ex. A. to Christiansen Decl*., Bates No. 124. Stakey continued to yell at the officers, as well as the EMT who attempted to examine him, again repeating himself multiple times.

MEMORANDUM DECISION AND ORDER - 9

As O'Brien and Christiansen were attempting to stand Stakey up, Stakey said his handcuffs were too tight. Christiansen told Stakey he would fix the cuffs but needed to get Stakey up first. *Ex. A. to Christiansen Decl*., Bates No. 124.

Christiansen placed Stakey in O'Brien's police truck; Stakey initially resisted but ultimately got into the truck. Christiansen stayed with Stakey as he was evaluated in the truck by the EMT, while O'Brien walked away from the truck to speak with Pumphrey and later sat in the driver's seat of the truck.

Stakey again claimed the handcuffs were too tight, and Christiansen said he would fix the cuffs once the EMT finished examining Stakey. *Ex. A to O'Brien Decl*., Bates No. 126; *Ex. A to Christiansen Decl*., Bates No. 124, 125. After the EMT was done, Christiansen removed Stakey's seat belt, pulled Stakey's sleeve out of his left handcuff, and loosened the cuffs. *Ex. A to Christiansen Decl*., Bates No. 125. Stakey said the left cuff was too tight, but Christiansen explained he had fixed the problem caused by Stakey's left sleeve, which had been caught in the cuff. Stakey did not again complain about the tightness of the handcuffs. *Id*.

The EMT later evaluated O'Brien and told him his finger was "busted." *Ex. A to O'Brien Decl*., Bates No. 126. The EMT also told officers Stakey did not appear competent to make his own medical decisions. *Ex. A to Christiansen Decl*., Bates No. 118.

Stakey kicked the inside of the police truck door repeatedly. Christiansen opened the door to investigate, and Stakey tried to kick Christiansen. *Id*. Stakey continued either kicking or elbowing the inside of the door. The video footage shows the door of the truck shaking and bending outward from Stakey's attacks. *Ex. A to Christiansen Decl*., Bates No. 119. Because the officers and medical first responders deemed it was unsafe to transport Stakey in the ambulance, O'Brien drove Stakey to the hospital for evaluation. *Id*.

MEMORANDUM DECISION AND ORDER - 10

Stakey continued his verbal onslaught against O'Brien on the way to the hospital, yelling at him and threatening him. Stakey repeatedly spewed profanity, insults, and slurs (including a staggeringly liberal use of the N-word) at O'Brien. *Ex. A to O'Brien Decl.*, Bates No. 127. Stakey also threatened to "destroy" the jail when he arrived there and to "fuck [O'Brien] up." *Id*.

Stakey continued his vitriol, including repeatedly calling O'Brien a "motherfucker," a "faggot," a "piece of shit," a "pussy-ass bitch," and a child molester or "chomo." *Ex. A to O'Brien Decl.*, Bates Nos. 127, 128. O'Brien did not engage with Stakey for the most part; yet Stakey kept up the stream of profanity and insults. Stakey appeared unable or unwilling to control himself. *Id*.

When O'Brien informed Stakey he was taking him to the hospital, Stakey claimed he did not need to go to the hospital and said, "Fuck that shit, I'm a big boy." *Ex. A to O'Brien Decl.*, Bates No. 128. O'Brien explained he was legally obligated to take Stakey to the hospital.

Stakey complained of thirst on the way to the hospital, but he did not claim his handcuffs were too tight. *Id*. Stakey did demand that O'Brien *remove* the handcuffs, evidently so Stakey could make good on his threat to "fuck [O'Brien] up." *Ex. A. to O'Brien Decl.*, Bates No. 127, 128. He made this demand several times.

When Stakey calmed down a bit, he asked O'Brien questions about the medical evaluation he would undergo, about the charges against him, and about what was happening to his girlfriend. O'Brien answered these questions in a calm and straightforward manner. *Ex. A to O'Brien Decl.*, Bates Nos. 129, 130.

Stakey alleges that his handcuffs were too tight for the duration of the journey to the hospital. As noted earlier, however, Stakey said no such thing to O'Brien.

The bodycam footage reveals that a reasonable observer would have suspected Stakey was impaired in some manner before, during, and after his arrest, as well as on the way to the hospital.

Indeed, Deputy Pumphrey believed Stakey was in a "roid rage." *Ex. A to O'Brien Decl.*, Bates No. 127.

As a result of the force used to effectuate his arrest, Stakey sustained internal bleeding, pain, a broken nose, blurred vision, and a concussion. *Am Compl.* ¶¶ 47-52, 68. Stakey also alleges the handcuffs were so tight that he suffered severe nerve damage and does not "have full feeling or function in his finger tips." *Id.*, ¶ 67.

O'Brien sustained injuries to his fingers and a permanent back injury for which he must take medication. *O'Brien Decl.*, ¶ 24.

As a result of the events of November 15, 2021, Stakey was charged with battery on a law enforcement officer, in violation of Idaho Code § 18-915(3)(b)(F). *Ex. A to Decl. of Sam Angell*, Dkt. 39-5. Though not relevant to Stakey's claims here, Stakey was also charged with malicious injury to property, stemming from his assault on the inside of the police truck. Stakey pleaded guilty to both charges. *Id.*

Stakey claims O'Brien's use of force against him on November 15, 2021 was unconstitutionally excessive, in violation of 42 U.S.C. § 1983, with respect to (1) the force used during the course of Stakey's arrest, and (2) the tightness of the handcuffs. Stakey also claims O'Brien committed the state law torts of assault and battery.

## C.    *O'Brien Is Entitled to Summary Judgment on Stakey's § 1983 Claims of Excessive Force*

Stakey asserts his excessive force claims under 42 U.S.C. § 1983, the federal civil rights statute. To state a plausible § 1983 claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). A defendant causes a constitutional deprivation within the meaning of § 1983 "if he does an affirmative act,

participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Claims of excessive force during the course of an arrest are analyzed under the Fourth Amendment. That amendment requires that officers use only an amount of force that is "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted).

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," and whether an officer's use of force was objectively reasonable is based on the totality of the circumstances. *Id.* at 396 (internal quotation marks and citation omitted). The reasonableness inquiry requires "balancing the nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake," *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053-54 (9th Cir. 2007) (internal quotation marks omitted).

When analyzing excessive force claims, courts must consider several factors in this balancing test. First, the "quantum of force" used by the police must be assessed. *Id.* at 1054. Force that imposes only a "minimal intrusion" upon the arrestee is considered minimal force. *Johnson v. Cnty. of Los Angeles*, 340 F.3d 787, 793 (9th Cir. 2003). Intermediate force is force that is "capable of inflicting significant pain and causing serious injury" and, "while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011). Baton-strikes, pepper spray, and tasers are examples of intermediate force. *Id.*; *Bryan v. MacPherson*, 630 F.3d 805, 825-26 (9th Cir. 2010). Finally, lethal or deadly force is "force that creates a substantial risk of causing death or serious

bodily injury"—a severe intrusion on the arrestee's Fourth Amendment interests. *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005).

Second, the governmental interests at stake must be balanced against the quantum of force used. The Court must analyze the governmental interests in light of the following factors: (1) the severity of the crime for which the plaintiff was arrested; (2) whether the plaintiff posed a threat to the safety of the officers or others; (3) whether the plaintiff was actively resisting arrest or attempting to flee; and (4) the availability of alternative methods of subduing the plaintiff. *Davis*, 478 F.3d at 1054.

If—after balancing "the gravity of the intrusion on the individual against the government's need for that intrusion," *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)—the reviewing court determines that the force applied was reasonable, summary judgment in favor of the officer is appropriate. However, if the evidence, when viewed in the light most favorable to the plaintiff, could support a finding that the force used was objectively unreasonable, then the officers are not entitled to summary judgment. *Smith*, 394 F.3d at 701.

The Supreme Court has emphasized that courts must not rely on their own hindsight in determining whether an officer's use of force was reasonable. Rather, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

    i.      Stakey's Claim of Excessive Force During the Course of His Arrest

A federal court may not entertain a § 1983 claim, including an excessive force claim, if a plaintiff's success on that claim would necessarily imply the invalidity of a criminal conviction. *Heck*, 512 U.S. at 486-87. Under *Heck*, a § 1983 action "is barred if—but only if—success in the action . . . would necessarily imply or demonstrate that the plaintiff's earlier conviction was

MEMORANDUM DECISION AND ORDER - 14

invalid." *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1006 (9th Cir. 2022) (en banc) (internal quotation marks and citation omitted). To overcome this bar, a plaintiff must show either that (1) the action, if successful, would *not* necessarily "demonstrate the invalidity of any outstanding criminal judgment" or (2) "the conviction or sentence has already been invalidated." *Id.* at 1005 (quoting *Heck*, 512 U.S. at 486-87).

Stakey does not contend his conviction for battery on an officer, arising out of the incident on November 15, 2021, has been invalidated. Thus, *Heck* will bar Stakey's excessive force claim if success on that claim would demonstrate or imply the invalidity of his conviction. In considering whether success on a § 1983 claim "would *necessarily* imply the invalidity of a conviction," a court "must determine which acts formed the basis for the conviction." *Lemos*, 40 F.4th at 1006.

In Idaho, the elements of the offense of battery on an officer are the following: (1) a battery; (2) upon a law enforcement officer; (3) *while the officer was engaged in the performance of the officer's duties*; and (4) the person charged with the battery knew or reasonably should have known the victim was a law enforcement officer. Idaho Code § 18-915; Idaho Crim. Jury Instr. 1212I. Stakey's conviction for battery on an officer arose during the same event upon which Stakey bases his excessive force claim—officers restrained and arrested Stakey. The use of force was therefore not "distinct temporally or spatially from the factual basis for" Stakey's conviction. *Beets v. Cnty. of Los Angeles*, 669 F.3d 1038, 1042 (9th Cir. 2012) (stating that *Heck* would not bar an excessive force claim "if the use of excessive force occurred *subsequent* to the conduct on which [the plaintiff's] conviction was based").

*Heck* bars Stakey's excessive force claim because a conviction under Idaho Code § 18-915 requires Stakey's battery on O'Brien to have occurred while O'Brien was engaged in the performance of his duties. As the Ninth Circuit has explained, the use of excessive force is not

MEMORANDUM DECISION AND ORDER - 15

within the performance of a law enforcement officer's duty. *Sanders v. City of Pittsburg*, 14 F.4th 968, 972 (9th Cir. 2021); *see also State v. Bishop*, 203 P.3d 1203, 1216 (Idaho Ct. App. 2009) ("[A]n unlawful act is not considered a duty" under Idaho Code § 18-705); *State v. Tiffany*, No. 37636, 2011 WL 11048163 at *3 (Idaho Ct. App. Oct. 12, 2011) (unpublished) (stating *Bishop*'s definition of "duties" applies to use of the word "duties" in Idaho Code § 18-915).

If Stakey were to succeed on his claim of excessive force during the course of his arrest, it would require a finding that O'Brien used excessive force and, thus, was *not* engaged in the performance of his duties during the altercation that led to Stakey's conviction for battery on an officer. Any such finding would negate an element of the offense, necessarily implying the invalidity of Stakey's conviction.

Stakey contends Pumphrey stated during an investigation of the incident that O'Brien's striking Stakey during the course of his arrest "may appear unreasonable or outside of a technique typically used; and therefore, maybe seen or considered unreasonable." *Stakey Decl.*, ¶ 64. Pumphrey went on to explain that O'Brien "faced a suspect attempting to resist-flee further into a roadway creating 'State Created Danger' concerns and forcibly resisting [officers'] attempts at least to protect/control the suspect." Ex. C to *Stakey Decl.*, Dkt. 44-3, at 20. Pumphrey also noted he could have missed seeing some of Stakey's actions because he was dealing with Stakey's girlfriend and was on the radio at the time. *Id*. at 21.

Stakey relies on Pumphrey's statement that O'Brien's striking Stakey could be seen as unreasonable. But it does not matter, for purposes of *Heck*, what Pumphrey (or anyone else) believed at the time of the incident or during the investigation that followed. Stakey's conviction for battery on an officer required O'Brien to be engaged in the performance of his duties. Success on Stakey's claim that O'Brien committed excessive force during the arrest—and, thus, was *not*

MEMORANDUM DECISION AND ORDER - 16

engaged in the performance of his duties—would necessarily imply the invalidity of Stakey's conviction.

Because Stakey's claim of excessive force during the course of his arrest is barred by *Heck*, the Court will grant summary judgment to O'Brien on this claim.

      ii.      <u>Stakey's Claim of Excessive Force by Handcuffing</u>

Although tight handcuffing can potentially be the basis of an excessive force claim, the mere allegation of an injury from handcuffs is insufficient. *Uzun v. City of Santa Monica*, 54 F.4th 595, 596 (9th Cir. 2022). Rather, there generally must also be evidence that officers were callously unresponsive to an arrestee's complaint about the tightness of the handcuffs or that officers were "rough and abusive" when applying the handcuffs. *Id*.

With respect to O'Brien's initial application of the handcuffs, consideration of the *Graham* factors leads the Court to conclude "the officers used only the force necessary to handcuff" Stakey. *Id*. at 596. The quantum of force used was minimal; it obviously was not deadly force, and handcuffing an arrestee is nothing like using a taser or a baton, which are examples of intermediate force. *See Young*, 655 F.3d at 1161; *Bryan*, 630 F.3d at 825-26. The crime for which Stakey was being investigated—driving under the influence—is a serious offense. Further, as the bodycam footage shows, Stakey posed a risk to the officers, and he was actively resisting arrest. Finally, handcuffs are the standard method used to restrain an arrestee; there does not appear to be any less intrusive means available to O'Brien at the time. The videos simply do not show that O'Brien used unreasonable force in initially applying the handcuffs.

Stakey later said the cuffs were too tight, and Christiansen promised to loosen them. Indeed, after getting Stakey out of the road and evaluated by the EMT, Christiansen *did* loosen them. Even if Christiansen—who is not a defendant in this case—had acted unreasonably in

waiting to loosen the handcuffs until Stakey had been examined by medical personnel, the same cannot be said of O'Brien.

Stakey can be seen and heard on the bodycam footage saying the handcuffs were too tight, but that was when he was with *Christiansen*, not O'Brien. And, Christiansen then loosened the handcuffs. Even assuming O'Brien was paying attention and heard Stakey discussing the handcuffs with Christiansen, the last thing he would have heard on the subject was Christiansen stating he would loosen the cuffs pursuant to Stakey's request. There is no evidence to suggest O'Brien disregarded any complaint about the tightness of the handcuffs—much less that he did so "callously." *Uzun*, 54 F.4th at 596.

O'Brien's evidence establishes that the *Graham* factors weigh in favor of a finding that any decision not to further loosen Stakey's handcuffs was reasonable. Thus, the burden shifts to Stakey to show a genuine dispute as to the reasonableness of the handcuffing.

Stakey has failed to do so. Stakey contends that, on the way to the hospital, he "pleaded with Defendant O'Brien to loosen" the handcuffs but that O'Brien "totally ignored and disregarded" Stakey's pleas. *Stakey Decl*., ¶ 58. This is plainly untrue.

Stakey can be heard on O'Brien's bodycam footage saying (and yelling) many things on the way to the hospital—but a complaint about the tightness of the handcuffs was *not* among them. *See Ex. A to O'Brien Decl*., Bates Nos. 127, 128, 129, 130. The Court need not credit Stakey's allegation on this point because it is blatantly contradicted by the record. *See Scott*, 550 U.S. at 380. It should go without saying that O'Brien was not required to comply with Stakey's demand that O'Brien remove the handcuffs entirely—Stakey was under arrest, after all, and was repeatedly threatening O'Brien. O'Brien did not callously disregard a risk that the handcuffs were too tight.

Even if the bodycam footage supported Stakey's claim that he pleaded with O'Brien to loosen the cuffs further—which it does not—the Court cannot say O'Brien acted unreasonably in not doing so. Stakey had resisted arrest, resisted being placed in the truck, destroyed the inside of the truck door, continuously yelled obscenities and insults, threatened O'Brien with bodily harm, and appeared to be out of control. These actions would lead a reasonable officer to conclude Stakey posed a serious risk of harm should the officer decide to stop the truck, open the door (thus placing Stakey in a situation where he could attempt to flee), and loosen the cuffs.

For the foregoing reasons, O'Brien is entitled to summary judgment on Stakey's excessive force claim based on the tightness of the handcuffs.

### D.    *O'Brien Is Entitled to Summary Judgment on Stakey's State Law Claims*

Stakey also brings claims of assault and battery under Idaho state law. O'Brien argues that he is immune from these state law claims. Under the Idaho Tort Claims Act, governmental employees are immune from liability for assault and battery so long as the employees were "acting within the course and scope of their employment and without malice or criminal intent." Idaho Code § 6-904 and subsection (3).

Acting with "malice" had been interpreted by the Idaho Supreme Court to mean "the intentional commission of a wrongful or unlawful act, without legal justification or excuse and *with ill will*, whether or not injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171, 183 (Idaho 1986). A person acts with "criminal intent" if he intentionally commits an act that "the person knows to be a crime." *James v. City of Boise*, 376 P.3d 33, 51 (Idaho 2016).

If the challenged act by a governmental employee occurred "within the time and at the place of his employment," the law presumes that the action occurred within the course and scope of that employment and without malice or criminal intent. Idaho Code § 6-903(5). This presumption is rebuttable. *Id*.

MEMORANDUM DECISION AND ORDER - 19

O'Brien has met his initial burden on summary judgment of establishing he is immune under the Idaho Tort Claims Act. It is undisputed that O'Brien was a Custer County Sheriff's Deputy and was working in that capacity at the time of the events giving rise to Stakey's claims. Therefore, O'Brien is entitled to the presumption that he acted within the course and scope of his employment and without malice or criminal intent.

Stakey has not rebutted this presumption. There is nothing in the record to suggest O'Brien intentionally committed a crime or that his actions were the result of ill will. As can be seen from the bodycam footage of Deputy O'Brien and Officer Christiansen, O'Brien used force against Stakey only after Stakey resisted arrest and turned toward O'Brien. Stakey contends O'Brien harbored "personal feeling[s] of anger and hatred" toward Stakey because of the encounter with Stakey the night before the arrest—when Stakey gave O'Brien a fake name—and because Stakey was on probation. *Stakey Decl.*, ¶¶ 52, 63. But Stakey has provided no evidence whatsoever to support this contention.

For these reasons, O'Brien is immune from Stakey's state law claims and is entitled to summary judgment on those claims.

**3.    Conclusion**

As explained above, O'Brien has met his initial burden of establishing that (1) Stakey's claim of excessive force during the course of arrest is barred by *Heck v. Humphrey*, (2) O'Brien did not engage in excessive force with respect to the tightness of Stakey's handcuffs, and (3) O'Brien is immune from Stakey's state law claims under the Idaho Tort Claims Act. Stakey has not met his burden to show the existence of a genuine dispute as to any material fact with respect to any of his claims. Therefore, the Court will grant O'Brien's Motion for Summary Judgment.

## ORDER

**IT IS ORDERED:**

1.      Defendant O'Brien's Motion for Summary Judgment (Dkt. 39) is GRANTED, and

the Court will enter judgment in favor of Defendant.

2.      Defendant O'Brien's Motion to Strike (Dkt. 47) is MOOT.

DATED: February 11, 2025

Amanda K. Brailsford
U.S. District Court Judge